AMERICAN MEDICAL ASSOCIATION,
et al., Plaintiffs,

v.

Margaret M. HECKLER, Secretary of the
United States Department of Health
and Human Services, Defendant.

No. IP 84–1317–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 18, 1985.

Newton G. Minow, Jack R. Bierig, David F. Graham, James C. Dechene, Chicago, Ill., Geoffrey Segar, Alan H. Lobley, Myra C. Selby, Ice Miller Donadio & Ryan, Indianapolis, Ind., Kirk B. Johnson, B.J. Anderson, Chicago, Ill., Richard King, Indianapolis, Ind., for plaintiffs.

Harold R. Bickham, Asst. U.S. Atty., Indianapolis, Ind., Leslie K. Dellon, Dept. of Justice, Civ. Div., Washington, D.C., Thomas W. Coons, U.S. Dept. of Health and Human Services, Baltimore, Md., for defendant.

American Association of Retired Persons, Michael R. Schuster, Washington, D.C., for amicus curiae.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARKER, District Judge.

This matter is before the Court on the December 3, 1984 motion of defendant Margaret M. Heckler, Secretary of the United States Department of Health and Human Services ("Secretary"), for judgment on the pleadings. Plaintiffs American Medical Association, Indiana State Medical Association, Dallas E. Coate, M.D., Richard G. Huber, M.D., Robert W. Mouser, M.D., Don J. Wagoner, M.D., Herschel S. Smith, M.D., George P. Maxwell, Catherine V. Maxwell, Geneva Thompson, Helen Wingfield, Nina Smith, Leola Ebert, and Ralph Bean ("plaintiffs" unless referred to individually) filed a memorandum in opposition to the Secretary's motion to dismiss for lack of jurisdiction, ripeness and standing and a memorandum in opposition to the Secretary's motion for judgment on the pleadings on January 15, 1985. The Secretary's reply brief was submitted on February 8, 1985. The parties have filed several supplemental briefs in support of their respective positions. Also before the Court is an *amicus curiae* brief of the American Association of Retired Persons.

Because the Secretary has presented matters outside the pleadings on its Motion for Judgment on the Pleadings, the Court shall treat the motion as one for summary judgment and dispose of it as provided in Rule 56 of the Federal Rules of Civil Procedure. *See* Rule 12(c) of the Federal Rules of Civil Procedure.

Based on the briefs of the parties, and the exhibits attached thereto, the Court, being duly advised in the premises, now submits its Findings of Fact and Conclusions of Law. In accordance therewith, the Court GRANTS the Secretary's Motion for Summary Judgment, DISMISSES with prejudice Counts I, IV, and V of plaintiffs' complaint, DISMISSES without prejudice Counts II and III of plaintiffs' complaint, and ORDERS that Judgment be entered for the Secretary.

### Findings of Fact

1. Plaintiff American Medical Association ("AMA") is a non-profit corporation operating under the laws of the State of Illinois. Its headquarters are located in Chicago, Illinois; it also has an office in Washington, D.C. The AMA represents approximately 254,000 physicians, approximately 4100 of whom practice in the State of Indiana.

2. Plaintiff Indiana State Medical Association ("ISMA") is a non-profit corporation operating under the laws of the State of Indiana. Its headquarters are located in Indianapolis, Indiana. The ISMA is comprised of approximately 6,000 physicians who practice medicine within the State of Indiana.

3. Plaintiff Dallas E. Coate, M.D. ("Dr. Coate"), is a physician licensed to practice medicine in Indiana and is a member of the ISMA. Dr. Coate resides at 504 West Camp Street, Lebanon, Indiana.

4. Plaintiff Richard G. Huber, M.D. ("Dr. Huber"), is a physician licensed to practice medicine in Indiana and is a member of the AMA and the ISMA. Dr. Huber resides at 219 Sycamore Drive, Bedford, Indiana.

5. Plaintiffs Nina Smith, Leola Ebert, and Ralph Bean ("plaintiff Medicare patients") all reside in or near Jamestown, Indiana. Each of these plaintiffs has been a patient of Dr. Coate. Also, each of these plaintiffs is enrolled in Part B of the Medicare Program.

6. Plaintiff Robert W. Mouser, M.D. ("Dr. Mouser"), is a physician licensed to practice medicine in Indiana and is a member of the AMA and ISMA. Dr. Mouser's offices are at 6201 North Park Avenue, Indianapolis, Indiana. Dr. Mouser did not elect to become a "participating physician," as that term is used in § 2306 of the Deficit Reduction Act ("Deficit Reduction Act," unless referred to by the Section number as codified in the United States Code.)

7. Plaintiffs George P. Maxwell, Catherine V. Maxwell, Geneva Thompson, and Helen Wingfield ("plaintiff Medicare patients") are all residents of Indianapolis, Indiana, and all have been patients of Dr. Mouser. Each of these individuals is enrolled in Part B of the Medicare Program.

8. Plaintiff Don J. Wagoner, M.D. ("Dr. Wagoner"), is a physician licensed to practice medicine in Indiana and is a member of the AMA and ISMA. He resides in Burlington, Indiana. Dr. Wagoner did not elect to become a "participating physician."

9. Plaintiff Herschel S. Smith, M.D. ("Dr. Smith"), is a physician licensed to practice medicine in Indiana and is a member of the AMA and ISMA. He resides at 316 East 4th Street, Bloomington, Indiana. Dr. Smith did not elect to become a "participating physician."

10. Defendant Margaret M. Heckler ("Secretary") is named as defendant in her official capacity as Secretary of the United States Department of Health and Human Services ("HHS"). In that capacity, the Secretary is responsible for implementing the Medicare provisions of the Deficit Reduction Act.

11. The Medicare Program consists of two separate parts. Part A, 42 U.S.C. §§ 1395c–1395i, covers services furnished by hospitals and related post-hospital services. Part B, 42 U.S.C. §§ 1395j–1395w, on the other hand, establishes a voluntary program of supplemental medical insurance benefits for certain medical services, including physicians' services. The subject of this lawsuit concerns Part B only.

12. Under Part B, a Medicare enrollee obtains benefits from the program in return for the payment of monthly premiums in an amount which is determined by the Secretary. 42 U.S.C. § 1395r(a). These premiums, and contributions from the federal government, make up the Federal Supplementary Medical Insurance Trust Fund, out of which payment is made for the benefits provided for in Part B. 42 U.S.C. § 1395t.

13. Medicare Part B payments for services are made on a "reasonable charge" basis. The procedure for determining the amount of a "reasonable charge" is set forth in 42 U.S.C. § 1395u(b), which provides in relevant part:

"In determining the reasonable charge for services for purposes of this paragraph, there shall be taken into consideration the customary charges for similar services generally made by the physician or other person furnishing such services, as well as the prevailing charges in the locality for similar services. No charge may be determined to be reasonable in the case of bills submitted or request for payment made under this part after December 31, 1970, if it exceeds the higher of (i) the prevailing charge recognized by the carrier and found acceptable by the Secretary for similar services in the same locality in administering this part on De-

cember 31, 1970, or (ii) the prevailing charge level that, on the basis of statistical data and methodology acceptable to the Secretary, would cover 75 percent of the customary charges made for similar services in the same locality during the last preceding calendar year elapsing prior to the start of the twelve-month period (beginning July 1 of each year) in which the services is rendered. . . ."

14. Prior to the enactment of the Deficit Reduction Act, an enrollee treated by a physician under Part B could pay for the medical services by either of two methods: (a) pay the physician directly and then request reimbursement from Medicare, 42 U.S.C. § 1395u(b)(3)(B)(i); or (b) if the physician was willing, assign to the physician the enrollee's right to reimbursement from Medicare, 42 U.S.C. § 1395u(b)(3)(B)(ii). Regardless of which option was chosen, Medicare would normally pay eighty percent (80%) of the "reasonable charge." 42 U.S.C. § 1395*l* (a)(1)(B).

15. Prior to the enactment of the Deficit Reduction Act, Medicare's "customary" and "prevailing" charge data was updated on July 1 of each year based on the prior year's data. Under the provisions set forth in 42 U.S.C. § 1395u, a physician could elect to accept or not to accept assignment on a case-by-case basis. If a physician chose not to accept assignment, there was no limitation on the amount a physician could charge a Medicare beneficiary; however, that group of physicians was permitted to obtain full payment of their actual billed charges from Medicare only to the extent of the physician's "reasonable charge," and the beneficiary remained responsible for the remainder of the charge.

16. The Deficit Reduction Act, which was signed by the President on July 18, 1984, made several changes which affect the way in which physicians will be reimbursed for services rendered to Medicare beneficiaries.

17. Section 2306(a) of the Deficit Reduction Act modified 42 U.S.C. § 1395u(b) by adding a new subsection (4). The new provision freezes both the "prevailing" and "customary" charge levels for the fifteen (15)-month period beginning July 1, 1984; physicians are not permitted to charge at levels higher than the levels set for the twelve (12)-month period beginning July 1, 1983:

" '(4)(A) In determining the prevailing charge levels under the third and fourth sentences of paragraph (3) for physicians' services furnished during the 15-month period beginning July 1, 1984, the Secretary shall not set any level higher than the same level as was set for the 12-month period beginning July 1, 1983.

'(B) In determining the reasonable charge under paragraph (3) for physicians' services furnished during the 15-month period beginning July 1, 1984, the customary charges shall be the same customary charges as were recognized under this section for the 12-month period beginning July 1, 1983.

'(C) In determining the prevailing charge levels under the third and fourth sentences of paragraph (3) for physicians' services furnished during periods beginning after September 30, 1985, the Secretary shall treat the level as set under subparagraph (A) changes which would have been taken into account but for the limitations contained in subparagraph (A).' "

42 U.S.C. § 1395u(b)(4) (1984).

18. Section 2306(c) of the Deficit Reduction Act amends 42 U.S.C. § 1395u by adding a new subsection (h). Subsection (h) required physicians to elect by October 1, 1984, whether or not to become a "participating physician." If a physician decided to become a "participating physician," he thereby agreed to accept all Medicare payments on the basis of "assignment," as that term is used in 42 U.S.C. § 1395u(b)(3)(B)(ii), during the twelve (12) month period beginning October 1. The "non-participating physicians," or those who did not agree to enter into an agreement with the Secretary to accept payment on an assignment basis, may continue to accept assignment on a case-by-case basis.

19. Section 2306(c) of the Deficit Reduction Act adds a new subsection (j) to 42 U.S.C. § 1395u. Subsection (j) provides that a non-participating physician may not charge a Medicare patient in excess of the physicians' actual charges for the calendar quarter beginning on April 1, 1984. The Secretary is required to monitor each physician's actual charges in order to determine whether to apply sanctions against those physicians who knowingly and willfully charge a Medicare patient an amount in excess of their actual charges during the second quarter of 1984. Section 2306(c) specifically provides:

" '(j)(1) In the case of a physician who is not a participating physician, the Secretary shall monitor each such physician's actual charges to individuals enrolled under this part for physicians' services furnished during the 15-month period beginning July 1, 1984. If such physician knowingly and willfully bills individuals enrolled under this part for actual charges in excess of such physician's actual charges for the calendar quarter beginning on April 1, 1984, the Secretary may apply sanctions against such physician in accordance with paragraph (2).

'(2) Subject to paragraph (3), the sanctions which the Secretary may apply under paragraph (1) are—

'(A) barring a physician from participation under the program under this title for a period not to exceed 5 years in accordance with the procedures of paragraphs (2) and (3) of section 1862(d), or

'(B) the imposition of civil monetary penalties and assessments, in the same manner as such penalties are authorized under section 1128A(a), or both. No payment may be made under this title with respect to any item or service furnished by a physician during the period when he is barred from participation in the program under this title pursuant to this subsection.' "

42 U.S.C. § 1395u(j) (1984).

20. Certain benefits are made available to those physicians who have decided to become "participating physicians." Section 2306 of the Deficit Reduction Act directs that the Secretary publish a directory of participating physicians to be made available to Medicare beneficiaries; maintain toll-free telephone numbers at which beneficiaries may obtain the names, addresses, telephone numbers and specialties of participating physicians; publish a list containing the name, address, specialty and percent of claims submitted with respect to each physician paid on an assignment basis; and provide for the electronic receipt by carriers of claims from participating physicians, thereby enabling those physicians to have their claims processed more quickly. 42 U.S.C. §§ 1395u(h)(2)–(3) (1984).

21. Another benefit made available to those physicians electing to become "participating physicians" is that after the freeze period has ended they could possibly bill at a higher rate than those physicians not participating. Section 2306(a) created a new subsection (4)(D) to 42 U.S.C. § 1395u(b), which specifies that in determining the customary charges of non-participating physicians for the twelve (12) month periods beginning October 1, 1985, and October 1, 1986, the Secretary shall not recognize increases in actual charges for services furnished during the fifteen (15) month freeze period. Participating physicians, on the other hand, may raise their actual charges during that same period. Although their reimbursement is limited by the customary and prevailing charge freeze while the freeze is in effect, participating physicians' actual charges will form the data base for computing their customary charge levels once the freeze is limited.

22. Senator Dole, Chairman of the Senate Committee on Finance had this to say about the Medicare portions of the Deficit Reduction Act:

"Under section 2306, $2.5 billion will be saved by freezing for 15 months the customary and prevailing charge levels used to determine what medicare will pay for physician services. Needless to say, there has been a great deal of concern about how physicians can be prevented from shifting the burden of such

a freeze to beneficiaries. *Simply freezing what we pay for physician services provides little protection to program beneficiaries.* If a physician does not elect to take assignment, beneficiaries can be held responsible for the full difference between what the program pays and what the physician charges.

Mr. President, the conferees spent a great deal of time in discussions with the administration trying to address this concern. As a result, the conferees agreed to a provision which works in concert with organized medicine's voluntary freeze."

130 Cong.Rec.S. 8373, 8375 (daily ed. June 27, 1984) (emphasis added), reprinted in 1984 U.S.Code Cong. & Admin.News, Deficit Reduction Act Legislative History 697 at 1462 (hereinafter "Legislative History").

23. Congressman Rostenkowski, Chairman of the House Committee on Ways and Means, made the following comments concerning § 2306 of the Deficit Reduction Act:

"There is a 15-month freeze on medicare-recognized physician fee increases, with protection for beneficiaries. Under this provision, doctors who become medicare 'participating physicians' would accept the medicare fee allowance as payment in full. Other physicians would be prohibited from raising their medicare fees. Thus, *beneficiaries would have full protection against the possibility that they rather than the physicians, might bear the effect of the fee freeze.* The fee freeze provisions are intended to work in concert with the efforts—which are to be commended—of the American Medical Association and many individual medical societies which have urged their members voluntarily to freeze their fees."

130 Cong.Rec.H. 7085, 7086 (daily ed. June 27, 1984) reprinted in Legislative History at 1450 (emphasis added). *Accord,* H.Conf. Rep. No. 98–861, reprinted in Legislative History at 751, 1308.

24. The Legislative History of § 2306 of the Deficit Reduction Act, as evidenced by

a House Committee Report, indicates the following:

"To protect beneficiaries from increased charges during the 15-month period when Medicare payment levels are frozen, the legislation provides that increased charges to Medicare patients by non-participating physicians would not be recognized in their customary charge update in further years. Further, if non-participating physicians do not comply with the fee freeze and increase their actual charges billed to Medicare patients, they would be subject to [penalties] ... The conference agreement provides the Secretary with the authority to impose civil money penalties or assessments, exclusion for up to five years from the Medicare program, or both. The purpose of this authority is to protect Medicare beneficiaries from increased charges from physicians who are not participating physicians."

H.Conf.Rep. at 1314, *reprinted in* Legislative History at 1308.

25. In September, 1984, the Secretary sent a letter ("Dear Doctor" letter) to physicians concerning the changes in the Medicare Program, the relevant portions of which are as follows:

"If you decide *not* to become a participating physician, the following will apply:

—You may continue to accept assignment on a case-by-case basis.

—You may not increase your charges to Medicare beneficiaries during the period July 1, 1984, through September 30, 1985, over what you charged for the same services during the period April 1, 1984, through June 30, 1984. (Where you had a general fee increase during the April 1, 1984—June 30, 1984 period, you may continue to charge the increased fee.) Medicare will enforce this requirement by comparing your pattern of charges for each service during the 15-month freeze period to your pattern of charges during the quarter beginning April 1, 1984. To comply with this

provision, you may simply continue the actual charging practices you followed in the April-June quarter.

*Example 1*: Dr. A charged Medicare beneficiaries $20 ninety percent of the time and $25 ten percent of the time for a brief office visit (CPT–4 code # 90040) during the April 1—June 30 period. Dr. A may not charge more than $20 in ninety percent of his billings for this service during the freeze period. He may charge up to $25 during the freeze period ten percent of the time.

*Example 2*: Dr. B charged Medicare beneficiaries $20 for a brief office visit during April 1984 and, following a general fee increase, $25 during May and June 1984. Dr. B may not charge more than $25 during the freeze period. Occasional higher fees would have to meet the criteria stated in Example 1.

In the event we find an indication of increases in charges in apparent violation of the freeze on fees, we will provide a physician with details on the claims in question and with an opportunity to furnish an appropriate explanation."

26. In Count I of this action the plaintiff physicians and the AMA assert that the portion of § 2306 of the Deficit Reduction Act which freezes the amount which non-participating physicians may charge their patients to their level of actual charges during the period of April 1, 1984, through June 30, 1984, discriminates in an arbitrary and irrational fashion against physicians who treat Medicare beneficiaries, which thereby violates the Equal Protection Clause of the Fourteenth Amendment as incorporated by the Fifth Amendment. These plaintiffs seek a judgment declaring that 42 U.S.C. § 1395u(j)(1)–(4) (1984) is unconstitutional, is null and void and of no effect and a permanent injunction prohibiting the Secretary from enforcing 42 U.S.C. § 1395u(j)(1)–(4) (1984).

27. In Count II of this action certain Medicare beneficiaries, physicians, the AMA, and the ISMA assert that as a direct and proximate result of the fee freeze portion of the Deficit Reduction Act, they will be unable to obtain medically necessary services and treatments from the physicians of their choice, which thereby deprives them of their rights under the First, Fourth, Fifth and Ninth Amendment, in that their fundamental rights of privacy, personal liberty, equal protection, due process, and protection against arbitrary and capricious governmental action have been violated. These Medicare beneficiaries also seek a judgment declaring that 42 U.S.C. § 1395u(j)(1)–(4) (1984) is unconstitutional, is null and void and of no effect, and a permanent injunction prohibiting the Secretary from enforcing 42 U.S.C. § 1395u(j)(1)–(4) (1984).

28. In Count III of this action, certain Medicare beneficiaries assert that the United States of America has breached its contractual promise that they would be entitled to freely choose without detriment among qualified physicians and that they would receive equivalently-calculated reimbursements for physicians' services regardless of their choice, in violation of the Due Process Clause of the Fifth Amendment. These plaintiffs seek a judgment declaring that 42 U.S.C. § 1395u(b)(4)(D) (1984) is unconstitutional, is null and void and of no effect, and a permanent injunction prohibiting defendant from enforcing 42 U.S.C. § 1395u(b)(4)(D) (1984).

29. In Count IV of this action, certain plaintiff physicians, the AMA, and the ISMA assert that the failure of the Secretary to release information essential to physicians' decisions whether to become participating physicians has caused enforcement of the October 1, 1984 deadline for physicians to decide whether or not to become participating physicians to be fundamentally unfair and in violation of the Due Process Clause of the Fifth Amendment. Plaintiffs seek a permanent injunction prohibiting the Secretary from requiring any physician to decide whether or not to become a participating physician or enforcing any deadlines with respect to that decision until such time as the Secretary

issues a lawful regulation defining the phrase "actual charges for the calendar quarter beginning on April 1, 1984." 42 U.S.C. § 1395u(j)(1) (1984). Plaintiffs also seek a permanent injunction prohibiting the Secretary from initiating or applying sanctions pursuant to 42 U.S.C. § 1395u(j)(2) (1984) against any physician for any actual charge less than the highest actual charge billed by that physician to any Medicare beneficiary for the subject service during the calendar quarter beginning April 1, 1984, which the physician may make prior to such time as the Secretary issues a lawful regulation defining the phrase "actual charges for the calendar quarter beginning on April 1, 1984." 42 U.S.C. § 1395u(j) (1984). The remainder of the issues in Count IV were decided by the Court in its September 28, 1984 Order and its October 11, 1984 Memorandum.

30. In Count V of this action, the plaintiff physicians, the AMA, and the ISMA assert that the Secretary, in defining the phrase "actual charges for the calendar quarter beginning on April 1, 1984" (42 U.S.C. § 1395u(j)(1)) without giving the public prior notice and an opportunity for comment, violated the requirements of the Administrative Procedure Act ("APA"). These plaintiffs seek a judgment declaring that the Secretary's definition of the words "actual charges" is unlawful and void and of no effect because of the Secretary's failure to comply with the APA. They also seek a permanent injunction prohibiting the Secretary from enforcing the sanctions of 42 U.S.C. § 1395u(j)(2) until such time as the Secretary issues a lawful regulation defining the phrase "actual charges for the calendar quarter beginning on April 1, 1984." (42 U.S.C. § 1395u(j)(1)).

31. Any finding of fact stated above, to the extent that it constitutes a conclusion of law, is herein incorporated by reference as an additional conclusion of law by the Court.

### Conclusions of Law

1. This Court has jurisdiction of these matters pursuant to 28 U.S.C. § 1331.

2. The plaintiff Medicare beneficiaries, specifically Leola Ebert, Nina Smith, and Ralph Beam, have not shown that they have suffered a distinct and palpable injury or that, as to them, there exists a case or controversy. As such, the claims of the plaintiff Medicare beneficiaries as alleged in Counts II and III of the complaint are dismissed without prejudice for lack of standing.

3. Because the plaintiff physicians, the AMA, and the ISMA have not shown a basis for standing independent from the Medicare beneficiaries in making their constitutional challenges in Count II, the claims in Count II are dismissed without prejudice as to them for lack of standing.

4. The equal protection issues in Count I are sufficiently ripe for adjudication by the Court for the reasons that the provisions of the Deficit Reduction Act alleged to be a violation of the Equal Protection Clause have been in effect since July, 1984, and the hardship to the parties could be substantial if a judicial determination is not made.

5. The claims in Counts IV and V are sufficiently ripe for adjudication by the Court for the reason that the alleged unlawful violation of the Administrative Procedures Act occurred in September, 1984. Also, a withholding of Court consideration of these issues might result in substantial hardship to the parties.

6. When a classification has been challenged under the Equal Protection Clause and it does not affect a personal right or does not draw upon inherently suspect classifications such as race, religion, or alienage, the Court must presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate governmental interest. Because the plaintiffs here challenge economic and social legislation (i.e., § 2306 of the Deficit Reduction Act) on equal protection

grounds, the applicable standard of review is the rational relationship test.

7. The legislative history of § 2306 of the Deficit Reduction Act shows that Congress intended to curtail the federal deficit and Medicare costs by freezing for the fifteen (15)-month period beginning July 1, 1984, and ending September 30, 1985, (1) the customary and prevailing charges of participating physicians and (2) the amount which non-participating physicians could charge Medicare beneficiaries to the level of actual charges for the calendar quarter beginning on April 1, 1984.

8. The freeze by Congress on the customary and prevailing charges of participating physicians and the freeze on non-participating physicians' fees to the level of their actual charges during the base period is rationally related to Congress' reasonable objective of controlling the federal deficit and Medicare costs. Plaintiffs have failed to show that the legislative facts upon which the classification was apparently based could not reasonably have been conceived to be true by Congress.

9. Section 2306 does not violate the Equal Protection Clause of the Fourteenth Amendment as incorporated by the Fifth Amendment.

10. The "Dear Doctor" letter sent by the Secretary to the physicians did rise to the level of a pronouncement; however, that letter constituted an interpretative rule within the meaning of 5 U.S.C. § 553(b)(3)(A), and was, therefore, exempt from the public notice and opportunity for comment requirement of 5 U.S.C. § 551(4). The Secretary's reference in the "Dear Doctor" letter to a "pattern of charges" and the two examples of compliance did nothing more than remind the physicians of their existing duties under § 2306 and advise physicians of her interpretation of the words "actual charges for the calendar quarter beginning on April 1, 1984." (42 U.S.C. § 1395u(j)(1) (1984)).

11. The Secretary's interpretation of the phrase "actual charges for the calendar quarter beginning on April 1, 1984" in the "Dear Doctor" letter as a "pattern of charges" is reasonable and consistent with the plain meaning of § 2306 of the Deficit Reduction Act.

12. The law is with the Secretary and against the plaintiffs on Counts I, IV, and V of the complaint.

13. Any conclusion of law stated below, to the extent that it constitutes a finding of fact, is herein incorporated by reference as an additional finding of fact by the Court.

### Memorandum

Plaintiffs have challenged the constitutionality of § 2306 of the Deficit Reduction Act, which was passed by Congress in 1984, along with many other measures to reduce the federal deficit, as a means of curtailing the increasing costs of the Medicare Program. Section 2306 freezes, for the fifteen (15)-month period beginning July 1, 1984, and ending September 30, 1985, the customary and prevailing charge levels of participating physicians, or those physicians who have elected to accept payment from Medicare on an assignment basis. The Act also freezes the amount which non-participating physicians may charge their Medicare patients to their level of actual charges during the period of April 1, 1984, through June 30, 1984. Certain benefits are made available to those physicians who elect to participate, while the Secretary may apply sanctions against those non-participating physicians who knowingly and willfully charge Medicare patients amounts in excess of their actual charges.

The plaintiff physicians, the AMA, and the ISMA contend that Congress, through § 2306, has unlawfully discriminated against the Medical profession in violation of the Equal Protection Clause. The plaintiff Medicare beneficiaries maintain that as a result of the fee freeze they will be unable to obtain medical services from the physician of their choice in violation of their constitutional rights and in breach of a contractual promise by the United States that they would be entitled to freely choose

among qualified physicians. Finally, the plaintiffs allege that the Secretary, in defining the term "actual charges," violated the notice and comment requirement of the Administrative Procedure Act. They seek declaratory and injunctive relief against the Secretary for these alleged violations.

In her motion, the Secretary has made several challenges to plaintiffs' complaint, the first of which is whether this Court has jurisdiction under 28 U.S.C. § 1331 to hear this matter. The Secretary maintains that even if jurisdiction is conferred upon the Court, the plaintiff Medicare beneficiaries lack standing to challenge the fee freeze and the claims of the plaintiff physicians and medical associations are not ripe for judicial review. For reasons discussed in detail below, the Secretary seeks judgment in her favor on all of the counts of the complaint, assuming the jurisdictional questions are not resolved in her favor.

## I. *Jurisdiction*

The first issue before the Court is the difficult question of whether pursuant to 28 U.S.C. § 1331 jurisdiction is conferred upon the Court over the issues of this case. The Secretary maintains that the recent decision by the Supreme Court in *Heckler v. Ringer*, ―― U.S. ――, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), bars federal question jurisdiction of this case. The Secretary argues that the specific language of § 205(h) of the Social Security Act, 42 U.S.C. § 405(h), precludes jurisdiction of this case under 28 U.S.C. § 1331; that section provides:

"The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under Section 1331 or 1346 of Title 28 to recover

er on any claim arising under this subchapter."

42 U.S.C. § 405(h).

In *Heckler v. Ringer, supra,* the plaintiffs-respondents challenged the policy of the Secretary relating to the payments of benefits for a surgical procedure known as bilateral carotid body resection ("BCBR"). The District Court had dismissed the case for lack of subject-matter jurisdiction, finding that the plaintiff was required to exhaust administrative remedies, pursuant to 42 U.S.C. § 405(g), prior to the filing of a lawsuit in federal court. The Court of Appeals reversed the lower court's decision and remanded the case for consideration of the merits. 104 S.Ct. at 2016.

In reversing the Court of Appeals, the Supreme Court stated that the third sentence of § 405(h) "made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides that § 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act." 104 S.Ct. at 2021–2022 (citing *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)). Reading § 405(h) broadly, the Court held that the inquiry in determining whether § 405(h) is a bar to federal question jurisdiction is whether the claim "arises under" the Act, not whether the claim could be characterized as substantive rather than procedural. *Id.* 104 S.Ct. at 2022. In other words, the Court construed "the 'claim arising under' language quite broadly to include any claims in which 'both the standing and the substantive basis for the presentation' of the claims is the Social Security Act." *Id.*

Applying that test to the facts in *Ringer,* the Supreme Court found that plaintiffs' challenge to the Secretary's BCBR payment policy indeed arose under the Medicare Act, and that § 405(h) barred federal question jurisdiction over plaintiffs' request for benefits. *Id.*

The Secretary in the present case argues that *Ringer* can logically be extended to this lawsuit. The Secretary maintains that because plaintiffs seek to enjoin the en-

forcement of the fee freeze, they must first present their claim to the Secretary prior to seeking judicial review of these provisions under 28 U.S.C. § 1331.

The Court concludes that this case does not fall under § 405(h) or within the holding of the *Ringer* opinion, in that the Court has not been asked to review "claims arising under the Medicare Act." Plaintiffs are not asking this Court to review a discretionary decision made by the Secretary pursuant to a provision of the Act which denies them a claim for reimbursement. Rather, the plaintiffs have requested that this Court review a portion of the Deficit Reduction Act to determine whether it passes constitutional scrutiny (Complaint, Count I–III). There is no administrative procedure within the Medicare Act for challenging the constitutionality of the Act itself. Administrative review of these claims could serve no purpose because the Secretary has no authority to grant the relief sought by the plaintiffs, to-wit: a declaration that the fee freeze portions of the Medicare Act are unconstitutional. Under such circumstances, the jurisdiction of this matter properly lies with the District Court. *See, e.g., Public Utilities Com. v. United States,* 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470, *reh. den.* 356 U.S. 925, 78 S.Ct. 713, 2 L.Ed.2d 760 (1958); *Heikkila v. Barber,* 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972, *reh. den.* 345 U.S. 946, 73 S.Ct. 828, 97 L.Ed. 1371 (1953); *Wong Yang Sung v. McGrath,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616, *mod. on other grounds* 339 U.S. 908, 70 S.Ct. 564, 94 L.Ed. 1336 (1950).

As stated by the Supreme Court in *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), a case in which the Court found that a district court lacked jurisdiction over a matter brought pursuant to § 405(g), "when constitutional questions are in issue, the availability of judicial review is presumed, and we will not read a statutory scheme [such as 42 U.S.C. § 405(h)] to take the 'extraordinary' step of foreclosing jurisdiction unless Congress' intent to do so is manifested by 'clear and convincing' evidence." *Id.* at 110, 97 S.Ct. at 986. *See also, Trinity Memorial Hospi-*

*tal v. Associated Hospital Service, Inc.,* 570 F.2d 660, 665 (7th Cir.1977). The Court added that:

> "Constitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decisions of such questions."

*Id.,* 97 S.Ct. at 986.

This Court also has jurisdiction over plaintiffs' allegations that the Secretary violated the Administrative Procedure Act when defining the phrase "actual charges for the calendar quarter beginning on April 1, 1984," 42 U.S.C. § 1395u(j)(1.) (1984) (Complaint, Counts IV–V). In *Bio-Medical Applications of Providence v. Heckler,* 593 F.Supp. 1233 (D.D.C.1984), the district court held that *Ringer* did not bar that court's jurisdiction over a claim that the Secretary failed to comply with the procedures of the APA. The court specifically found that the action was not one for additional benefits, but rather a claim to " 'vindicate an interest in procedural regularity.' " 593 F.Supp. at 1236 (citations omitted). In making this finding, the court reasoned that:

> "[i]f defendant's argument were to be accepted, it would mean that any procedural dispute which had even the most tangential affect on reimbursement amounts would be precluded from judicial review, thus in effect exempting the entire Medicare area from the provisions of the APA. This is certainly not what Congress envisioned, and not what the Courts have held."

*Id.* This Court agrees with the court in *Bio-Medical.* Section 405(h) does not bar plaintiffs' claims that the Secretary failed to abide by the provisions of the APA.

## II. *Standing*

The Secretary contends that the plaintiff patients lack standing to challenge the constitutionality of the fee freeze as alleged in Counts II and III of the complaint. Specifically, the Secretary argues that the plaintiff patients allege only that they will, in the future, be unable to obtain treatment

by a physician of their choice, or that they are "likely" to receive lesser reimbursements from Medicare. In their response, plaintiffs contend that they have shown a direct injury and a causal relationship between the injury and the relief they seek. The alleged injury is said to be evidenced by the fact that "Drs. Coate and Huber will be compelled to cease providing treatment to Medicare beneficiaries" and that the physicians "have clearly alleged that they will stop treating plaintiffs unless enforcement of the freeze is halted." For the following reasons, the Court agrees with the Secretary that the plaintiff patients have not met their burden of showing that there exists a case or controversy. As such, the claims of the plaintiff patients must be dismissed without prejudice for lack of standing.

■■■ Article III of the United States Constitution limits the jurisdiction of the federal courts to the resolution of "cases and controversies." The concept of standing is part of this limitation placed on the courts. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 37, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). As stated in the recent Supreme Court decision of *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the requirements of Article III are not met

> "merely because a party requests a court of the United States to declare its legal rights, and has couched that request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process. The judicial power of the United States defined by Article III is not unconditioned authority to determine the constitutionality of legislative or executive acts."

*Id.* at 471, 102 S.Ct. at 748. In order to determine whether a plaintiff has standing, the Court must examine whether the plaintiff has alleged a sufficiently "distinct and palpable injury," *see Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), as well as a " 'fairly traceable' causal connection between the claimed injury and the challenged conduct." *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 78–79, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978) (citations omitted). Stated another way:

> "at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' [*Simon, supra.*]."

*Valley Forge College, supra.,* 454 U.S. at 472, 102 S.Ct. at 758.

In Count II, plaintiff Medicare beneficiaries alleged that as a result of the fee freeze they "will be" unable to obtain medical services from the physicians of their choice, which violates the First, Fourth, Fifth and Ninth Amendments. Count III is similar, in that it alleges that the United States has breached its contractual promise to Medicare beneficiaries that they would be entitled to choose without detriment among qualified physicians, all in violation of the Due Process Clause of the Fifth Amendment.

Plaintiff Medicare beneficiaries have failed to satisfy the first standing requirement, that is, to demonstrate a distinct and palpable injury. The complaint and affidavits of the plaintiffs speak in terms of what will happen if the fee freeze is allowed to continue *in futero,* and not of how they have been injured thus far by operation of the fee freeze.

There is no evidence that either Dr. Coate or Dr. Huber has refused to treat any of plaintiff Medicare beneficiaries, or any Medicare beneficiary for that matter. It is only alleged that they will stop treating Medicare patients unless the Court prevents the enforcement of the fee freeze.

In Dr. Coate's affidavit, he states that the reason he has not closed his Jamestown, Indiana medical office "is because of this lawsuit and my hope that the Court would hold the freeze of my fees unlawful." Dr. Coate states that even if he did close the Jamestown office, "most of my patients could visit my Lebanon office." Thus, Dr. Coate's affidavit contradicts his allegation that he will stop treating Medicare beneficiaries unless the freeze is declared unconstitutional.

There is nothing in the record to show that plaintiffs Leola Ebert, Nina Smith, or Ralph Beam have been denied access to the physician of their choice. In her affidavit, Leola Ebert states that she has developed a trust for Dr. Coate and that she does not want him to close the Jamestown office. She does not state that Dr. Coate, the doctor of her choice, has denied her medical services of any kind since the fee freeze went into effect.

There is also nothing in the record which shows that Dr. Huber has denied medical services to his Medicare patients because of the fee freeze and nothing in the record to show that a Medicare patient has been denied the services of Dr. Huber because they are a Medicare patient.

Federal courts cannot entertain claims which are founded on sheer speculation as to what may or may not happen under particular circumstances. This Court may only hear those disputes which are real, immediate, and concrete, that is, cases or controversies. The Court cannot rely on promises or threats of future action vaguely contingent upon the outcome of certain other events or decisions; it cannot rely on mere possibilities of fact. Here, the fee freeze has been in effect since October 1, 1984, and plaintiff Medicare beneficiaries have wholly failed to demonstrate that anyone has denied them access to physicians of their choice.

Without some showing of a distinct and palpable injury on the part of one of the plaintiff patients, their claims in Counts II and III of the complaint must be dismissed without prejudice for lack of standing to advance such constitutional challenges. Although the plaintiff physicians, the AMA, and the ISMA have joined in the request for relief in Count II, they have not shown an independent basis for standing in making these constitutional challenges; therefore, Count II is also dismissed as to these plaintiffs, for the same reasons.

## III. *Ripeness*

The Secretary has moved that Counts I, IV, and V of the complaint be dismissed because those issues are not sufficiently ripe for judicial review. Count I alleges that the fee freeze discriminates in an arbitrary and irrational fashion against physicians who treat Medicare beneficiaries, in violation of the Equal Protection Clause. In Counts IV and V plaintiffs allege that the Secretary's definition of the phrase, "actual charges for the calendar quarter beginning on April 1, 1984" (42 U.S.C. § 1395u(j)(1)), was done without the opportunity for notice and comment in violation of the APA. The relief requested by plaintiffs in these counts is a judicial declaration that the Secretary's definition of actual charges is void, and an order enjoining the Secretary from enforcing the sanctions in 42 U.S.C. § 1395u(j)(2) until such time as the Secretary issues a regulation in compliance with the APA.

In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court "set forth two criteria for use in evaluating whether or not an action is ripe for judicial resolution." *Koehring Co. v. Adams*, 605 F.2d 280, 282 (7th Cir.1979). These criteria are as follows:

"(1) 'the fitness of the issues for judicial decision,' and

(2) 'the hardship to the parties of withholding court consideration.' "

*Id.* (quoting *Abbott Labs*, 387 U.S. at 149, 87 S.Ct. at 1515).

Application of these criteria herein demonstrates that the issues in Counts I, IV, and V are sufficiently ripe for judicial review by the Court. More specifically, the

equal protection issues in Count I are presently fit for resolution by the Court because the fee freeze provisions of the Deficit Reduction Act that are alleged to be a violation of plaintiffs' equal protection rights have been in effect since July, 1984. Also, if the fee freeze were found to be violative of plaintiffs' constitutional rights, the resultant hardship to plaintiffs is potentially substantial, in that the plaintiff physicians would suffer a loss equal to the difference between what they would have charged for medical services had there been no freeze and what they are permitted to charge under the freeze.

The claims in Counts IV and V are also ripe for judicial review. The Secretary argues that plaintiffs cannot challenge the constitutionality of the sanctions available to the Secretary under 42 U.S.C. § 1395u(j.)(1) because no enforcement action has ever been initiated by the Secretary against the plaintiff physicians. The Court agrees with the Secretary that such a challenge would not be ripe for judicial review where no sanction proceeding has been initiated by the Secretary. However, the legal issues in Counts IV and V are not related to the sanction provisions of the Act; rather, those counts challenge the Secretary's compliance with the APA in defining the term "actual charges" in the "Dear Doctor" letter (*see* Findings of Fact 29 and 30). The apparent confusion concerning the sanction provisions has arisen because plaintiffs have sought a permanent injunction against the Secretary prohibiting her from initiating or applying for sanctions against a physician until such time as the Secretary issues a lawful regulation defining the term "actual charges." Thus, the appropriateness of sanctions is to be addressed only if it is determined that the Secretary violated the APA. Whether the Secretary's actions in interpreting the words "actual charges" in the "Dear Doctor" letter were in compliance with the provisions of the APA, is an issue ripe for judicial review.

In summary, then, to the extent that plaintiffs challenge the authority of the Secretary to initiate proceedings or impose sanctions pursuant to § 1395u(j.)(1), Counts IV and V are not ripe for judicial review. The equal protection issues and the claims related to the Secretary's compliance with the APA are, however, ripe for judicial resolution.

## IV. *Substantive Issues*

The remaining issues now before the Court are these: (1) whether Section 2306(c) of the Deficit Reduction Act, 42 U.S.C. § 1395u(j), which freezes the amount which non-participating physicians may charge Medicare beneficiaries to the level of actual charges for the calendar quarter beginning April 1, 1984, violates the Equal Protection Clause of the Fourteenth Amendment as incorporated by the Fifth Amendment (Complaint, Count I); and (2) whether the Secretary, in defining the phrase "actual charges for the calendar quarter beginning in April 1, 1984" (42 U.S.C. § 1395u(j)(1)), without giving public notice and opportunity for comment violated the requirements of the Administrative Procedure Act. The Court finds, for the reasons set forth below, that the law is with the Secretary and against the plaintiffs, that the claims in Counts I, IV, and V of the complaint should be dismissed with prejudice, and that a judgment on these issues be entered for the Secretary.

## A. EQUAL PROTECTION

Under Section 2306(c) of the Deficit Reduction Act, 42 U.S.C. § 1395u(h) (1984), physicians were required to elect by October 1, 1984, whether to become "participating physicians." By becoming a participating physician, the physician thereby agreed to accept all Medicare payments for treating Medicare patients on an assignment basis. The non-participating physicians could continue to accept assignment on a case-by-case basis. However, Section 2306(c), 42 U.S.C. § 1395u(j), also provides that a non-participating physician may not charge a Medicare patient in excess of the physicians' actual charges for the calendar quarter beginning on April 1, 1984. The

Secretary, who is required to monitor each physician's actual charges, may bring sanctions against those non-participating physicians who knowingly and willfully charge a Medicare patient an amount in excess of their actual charges during the second quarter of 1984.

The plaintiffs' first argument is that, although the stated purpose of § 2306 is to reduce the federal deficit by limiting the amount that the federal government will pay for services to Medicare beneficiaries, it goes beyond that stated purpose to limit as well the amount that physicians may charge to Medicare beneficiaries independently of what Medicare will pay. Plaintiffs contend that there is no rational relationship between the fee freeze and the stated objectives and that the freeze serves no other legitimate governmental purpose.

It is well established that when economic or social legislation such as the Deficit Reduction Act is challenged upon equal protection grounds, the applicable standard of review is the rational relationship test. That is, when a classification does not affect a personal right or does not draw upon inherently suspect classifications such as race, religion, or alienage, the Court must "presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate [governmental] interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–2517, 49 L.Ed.2d 511 (1976). *See also Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080–1081, 67 L.Ed.2d 186 (1981).

The scope of judicial review in these matters is extremely narrow: "this Court properly exercises only a limited review power over Congress, the appropriate representative body through which the public makes democratic choices among alternative solutions to social and economic problems." *Schweiker v. Wilson, supra* at 230, 101 S.Ct. at 1080. In order to prevail, those challenging the legislation " 'must convince the Court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision-maker.' " *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981) (quoting *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 950, 59 L.Ed.2d 171 (1979)). It is not enough to show that the classifications are imperfect.

"As long as the classificatory scheme chosen by Congress rationally advances a reasonable and identifiable governmental objective, we must disregard the existence of other methods of allocation that we, as individuals, perhaps would have preferred."

*Schweiker v. Wilson, supra.* at 235, 101 S.Ct. at 1083.

The legislative history of § 2306 shows that Congress intended to curtail the federal deficit and Medicare costs by freezing the customary and prevailing charges of physicians' services for the fifteen (15)-month period beginning July 1, 1984, and ending September 30, 1985. (See Findings of Fact 22 and 23). Congress obviously was concerned that by simply freezing these charge levels, little protection would be afforded the Medicare beneficiaries. Without more, a physician who elected not to participate in the Medicare program would hold a beneficiary responsible for the difference between what the program would pay and what the physician would charge. (*Ibid.*) In other words, although Congress wanted to hold down the costs associated with the Medicare Program, it did not want to shift the financial burden of the Medicare Program to patients being treated by non-participating physicians. Therefore, Congress chose to freeze the amount which non-participating physicians could charge Medicare beneficiaries at the level of "actual charges for the calendar quarter beginning on April 1, 1984." (42 U.S.C. § 1395u(j)(1)). In order to fully understand Congress' concerns, it is helpful to analyze the following excerpt from the House Conference Report:

"To protect beneficiaries from increased charges during the 15-month period when Medicare payment levels are fro-

zen, the legislation provides that increased charges to Medicare patients by non-participating physicians would not be recognized in their customary charge update in future years. Further, if non-participating physicians do not comply with the fee freeze and increase their actual charges billed to Medicare patients, they would be subject to [penalties] ... The conference agreement provides the Secretary with the authority to impose civil money penalties or assessments, exclusion for up to five years from the Medicare program, or both. The purpose of this authority is to protect Medicare beneficiaries from increased charges from physicians who are not participating physicians."

H.Conf.Rep. at 1314, *reprinted in* Legislative History at 1308. Finding of Fact 24; *see also* Finding of Fact 2.

The Court finds that Congress has reasonably determined that by freezing the customary and prevailing charge levels of participating physicians and by freezing the actual charges of non-participating physicians, it could impose reasonable means of reducing the federal budget without burdening Medicare beneficiaries. Congress' decision to attack the problem of rising medical costs to Medicare beneficiaries by freezing the reimbursement to one group of physicians who accept all Medicare patients on an assignment basis and the actual charges of another group who do not has a rational relationship to Congress' objectives in controlling such medical costs.

Through affidavits, plaintiffs attempt to show that Congress was mistaken in its assumption that the fee freeze would prevent the shifting of any costs associated with the Medicare Program from physicians to Medicare patients. However, such evidence does not convince the Court that the " 'legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision-maker.' " *Minnesota v. Clover Leaf Creamery Co., supra,* 449 U.S. at 464, 101 S.Ct. at 724. It was reasonable for Congress to foresee, as it did,

that the physicians who treat Medicare patients on a non-assignment basis might attempt to pass along the financial burden to those patients.

For these reasons the Court finds that plaintiffs have suffered no violation of their Equal Protection rights and, accordingly, Count I must be dismissed.

### B. COMPLIANCE WITH THE ADMINISTRATIVE PROCEDURE ACT

In Counts IV and V of the complaint, plaintiffs contend that the Secretary violated the notice and comment requirements of the Administrative Procedure Act in the "Dear Doctor" letter when she defined the phrase, "actual charges for the calendar quarter beginning on April 1, 1984," and provided physicians with two examples of ways in which a non-participating physician should or could comply with the fee freeze (*see* Finding of Fact 25). The "Dear Doctor" letter states that if a physician elects to become a non-participating physician, he may not increase his charges to Medicare beneficiaries during the period July 1, 1984, to September 30, 1985, over the amount that he charged for the same services during the period April 1, 1984, through June 30, 1984. The letter then states: "Medicare will enforce this requirement by comparing your pattern of charges for each service during the quarter beginning April 1, 1984." The examples used by the Secretary to explain her interpretation of this phrase are as follows:

*"Example 1:* Dr. A charged Medicare beneficiaries $20 ninety percent of the time and $25 ten percent of the time for a brief office visit (CPT–4 code # 90040) during the April 1—June 30 period. Dr. A may not charge more than $20 in ninety percent of his bilings for this service during the freeze period. He may charge up to $25 during the freeze period ten percent of the time.

*Example 2:* Dr. B charged Medicare beneficiaries $20 for a brief office visit during April 1984 and, following a general fee increase, $25 during May and June

1984. Dr. B may not charge more than $25 during the freeze period. Occasional higher fees would have to meet the criteria stated in Example 1."

("Dear Doctor" letter, Finding of Fact 25). It is undisputed that the Secretary sent the "Dear Doctor" letter without affording plaintiffs prior notice or opportunity for comment.

The Secretary argues that the two examples cited in her "Dear Doctor" letter do not rise to the level of a pronouncement subject to the provisions of the APA. Alternatively, the Secretary argues that even if the APA applies, these examples are, at most, an interpretative rule or general statement of policy, and are, therefore, expressly exempt from the notice and comment requirements under 5 U.S.C. § 553(b)(3)(A).

For the reasons stated below, the Court finds that the "Dear Doctor" letter does rise to the level of a pronouncement, but that it constituted an interpretative rule within the meaning of 5 U.S.C. § 553(b)(3)(A). As such, it was exempt from the requirements of public notice and opportunity for comment.

■■■ Generally, an administrative agency is subject to the notice and comment requirements of the APA, set forth at 5 U.S.C. § 553, in that the agency must publish "notice of proposed rulemaking" and give "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments...." 5 U.S.C. § 553(c). See Commodity Future Trading Commission v. Hunt, 591 F.2d 1211, 1216 (7th Cir.1979). A "rule" is defined in 5 U.S.C. § 551(4), as follows:

"(4) 'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances thereof or of valuations, costs, or accounting, or practices bearing on any of the foregoing; ..."

An administrative agency is excluded from the notice and comment requirement by operation of 5 U.S.C. § 553(b)(3)(A) if the rule in question is determined to be an interpretative rule or a general statement of policy. Because the distinction between "interpretative rules" and rules subject to the public input may be "fuzzy," see Pacific Gas & Electric Co. v. Federal Power Commission, 506 F.2d 33, 37 (D.C.Cir. 1974), the Court must carefully examine the unique facts of each case.

■■■ A legislative rule is issued by an agency pursuant to statutory authority implementing the statute and " 'ha[s] the force and effect of law. 2399, 2405, 53 L.Ed.2d 448.' " Batterton v. Francis, 432 U.S. 416, 425 & n. 9, 97 S.Ct. 2399, 2405–06, 53 L.Ed.2d 448 (1977). (Citations omitted.) An agency promulgates a legislative rule when it "intends to create new law, rights or duties." General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C.Cir. 1984). See also, Powderly v. Schweiker, 704 F.2d 1092, 1098 (9th Cir.1983); Louisiana-Pacific Corp. v. Block, 694 F.2d 1205, 1209–1210 (9th Cir.1982). An interpretative rule, by contrast, is a rule or statement issued by an agency which advises the public of its construction of the statutes or regulations that it administers. See Energy Consumers v. Department of Energy, 632 F.2d 129, 140 (Temp.Emp.Ct.Appt. 1980), cert. denied, 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980); Guardian Federal Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corporation, 589 F.2d 658, 664–665 (D.C.Cir.1978). "An interpretative rule simply states what the administrative agency thinks the statute means, and only 'reminds affected parties of existing duties.' " General Motors, supra, 742 F.2d at 1565 (quoting Citizens to Save Spencer County v. EPA, 600 F.2d 844, 876 & n. 153 (D.C.Cir.1979)).

Contrary to plaintiffs' claim, the Secretary did not define in the "Dear Doctor"

letter the phrase "actual charges in excess of such physician's actual charges for the calendar quarter beginning on April 1, 1984." Rather, through the "Dear Doctor" letter, the Secretary informed physicians, "Medicare will enforce this requirement by comparing your pattern of charges for each service during the 15-month freeze period to your pattern of charges during the quarter beginning April 1, 1984." The Secretary also provided two examples of a non-participating physician's compliance with the fee freeze. The Secretary's reference to a "pattern of charges" and the two examples of compliance do nothing more than advise physicians of her interpretation of § 2306, which she is required to administer and enforce. The Secretary did not create any new law or impose any new duties on physicians by or through her "Dear Doctor" letter, as it was Congress, not the Secretary, who required non-participating physicians to limit their fees during the freeze to their "actual charges" for the base period.

Plaintiffs support their position that the "Dear Doctor" letter was a legislative rule by relying on *Allied Van Lines, Inc. v. I.C.C.*, 708 F.2d 297 (7th Cir.1983), which sets forth three criteria for determining whether a rule is legislative or interpretative. *Allied Van Lines* requires the Court to determine "whether Congress specifically delegated to the agency authority to adopt rules on the subject matter; whether the decision is binding upon other parties; and whether the rule operates retroactively." 708 F.2d at 300. Plaintiffs argue that the facts of this case dictate an affirmative finding as to the three criteria and thus warrant a conclusion that the "Dear Doctor" letter was a legislative rule, subject to notice and comment requirements.

The Court disagrees. Although the Secretary has authority under 42 U.S.C. § 1395hh to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs under [Medicare]," not every agency pronouncement is a legislative rule subject to the notice and comment requirements of the APA.

"It is well established that an agency charged with a duty to enforce or administer a statute has inherent authority to issue interpretative rules informing the public of the procedures and standards it intends to apply in exercising its discretion."

*Production Tool Corp. v. Employment & Training Admin.*, 688 F.2d 1161, 1166 (7th Cir.1982) (citations omitted). Although the Secretary had the authority to promulgate regulations in the Medicare Program area, the "Dear Doctor" letter was an interpretation of the meaning of the term "actual charges" as used by Congress in § 2306 of the Deficit Reduction Act, and it, therefore, did not resemble a legislative rule or regulation.

The plaintiffs' main contention is that the Secretary's interpretation of "actual charges" is binding on all physicians. The Secretary's statements in the "Dear Doctor" letter are binding on the physicians only to the extent that they are on notice of how she intends to interpret 42 U.S.C. § 1395u(j)(1) for enforcement purposes. All interpretative rules would be binding in that sense, as the regulated parties know that actions not in conformity with an agency's interpretation of a statute may be viewed by the agency as a violation of the statute. *See Alcaraz v. Block*, 746 F.2d 593, 614 (9th Cir.1984). This does not, however, convert an interpretative rule into a legislative rule which has the "force and effect of law." *Batterton v. Francis*, 432 U.S. at 425 n. 9, 97 S.Ct. at 2405. The requirement that non-participating physicians may not charge a Medicare patient more than their "actual charges" for the base period emanates from the law itself and thus gathers its force as law; it does not result from the Secretary's interpretation as communicated through the "Dear Doctor" letter.

Although the "Dear Doctor" letter was sent in September, 1984, the fee freeze became effective July 1, 1984. The plaintiffs argue that the "Dear Doctor" letter thereby has retroactive effect. Because

Congress has expressly limited the Secretary's authority to apply sanctions only to those situations in which a non-participating physician "knowingly and willfully bills" for actual charges in excess of such physician's actual charges for the base period, there is, however, no danger of retroactive effect. The "Dear Doctor" letter merely apprised physicians of what the agency "thinks the statute means and 'only reminds [the physicians] of existing duties'" as those duties were imposed by Congress under § 2306, for purposes of future enforcement of the fee freeze ("Dear Doctor" letter). A physician who in good faith prior to receiving the Secretary's letter charged a patient in violation of the Act would not be subject to sanctions for acting "knowingly and willfully," pursuant to § 2306. Conversely, if a physician knowingly and willfully charged a patient above the actual charges in violation of the Act, he would be subject to sanctions, regardless of the Secretary's interpretation of the rule. The Secretary's September, 1984 interpretation imposed no duties on the physicians which had not already been in existence as of July 1, 1984.

Alternatively, plaintiffs argue, if the Secretary's definition of "actual charges" is determined to be an interpretative rule, this Court should reject the Secretary's definition on the ground that it is unreasonable and inconsistent with the intent of Congress. Plaintiffs contend that this Court is free to substitute its own interpretation for that of the agency, and have asked the Court to declare that the term "actual charges" refers to the highest actual charge per procedure during the base period.

Plaintiffs misconstrue the powers of this Court if they assume it is free to substitute its interpretation for that of the Secretary. To the contrary,

"[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, .... Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."

*Chevron, USA, Inc. v. Natural Resources Defense,* — U.S. —, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted). Here, Congress did not elaborate upon the phrase "actual charges for the calendar quarter beginning on April 1, 1984." Therefore, this Court's inquiry is limited to whether the Secretary's interpretation is "'sufficiently reasonable' to be accepted by a reviewing court." *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981) (citations omitted). If so, the Secretary's interpretation must be upheld, even if other possible constructions exist or even if this Court might have adopted a different construction. *See, e.g., Chevron, USA,* 104 S.Ct. at 2782 n. 11; *Democratic Senatorial Campaign Committee,* 454 U.S. at 39, 102 S.Ct. at 46; *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978).

The Secretary's interpretation of "actual charges" as a pattern of charges is reasonable and consistent with the plain meaning of the statute. Under the Secretary's interpretation, if a physician charged $10.00 for a service ninety percent of the time and $25.00 for that service ten percent of the time during the base period, non-participating physicians may only charge $10.00 for that service ninety percent of the time during the freeze. Under plaintiffs' interpretation of "actual charges," if a physician charged $25.00 even once during the base period for a service for which he would normally charge $10.00, he could charge all

Medicare beneficiaries the treated $25.00 for that service throughout the freeze period. The more reasonable interpretation of the words "actual charges" is to allow physicians to charge during the freeze exactly what their actual charges were during the base period, which is the thrust of the Secretary's interpretation of the statute. The substitution of plaintiffs' interpretation of "actual charges" for that issued by the Secretary is more likely to distort the plain meaning of the phrase and frustrate Congressional intent. While the Secretary's interpretation may not be the only fair or desirable interpretation of the statute, it is sufficiently reasonable to conform with both the plain language and intent of § 2306.

For all these reasons, judgment shall be entered for the Secretary on Counts IV and V of the Complaint.