**Bertha GARELICK, Yolanda Restaino, Elena Savino, David Atkinson, Bruce Konrad and Peter T. Pickering, Plaintiffs,**

v.

**Louis W. SULLIVAN, as Secretary of the Department of Health and Human Services, and William Toby, as Administrator, Health Care Financing Administration, Region II, Defendants.**

No. 91 Civ. 4524 (WCC).

United States District Court, S.D. New York.

Feb. 14, 1992.

As Amended Nunc Pro Tunc April 24, 1992.

Brown & Seymour, New York City (Whitney North Seymour, Jr., Craig A. Landy, Peter James Clines, of counsel), for plaintiffs.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Linda A. Riffkin, Sp. Asst. U.S. Atty., of counsel), for defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

In this action for declaratory judgment and preliminary and permanent injunctive relief, plaintiffs, three hospital-based anesthesiologists and three patients enrolled in Medicare Part B, challenge the constitutionality of section 6102(a) of the Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101–239, 103 Stat. 2106 (codified at 42 U.S.C. § 1395w–4(g)) ("OBRA–89"). This provision sets limits on the amounts that physicians may charge Medicare patients for their services. The action is currently before the Court on plaintiffs' motion for summary judgment as to all claims and on defendants' cross-motion for summary judgment dismissing plaintiffs' claims.

## BACKGROUND

The Medicare program is comprised of two parts—Part A and Part B. Part A, which is not implicated in the instant case, provides institutional health coverage for hospital care and related post-hospitalization services. Part B of the Medicare Act, 42 U.S.C. §§ 1395j–1395w, is a federally subsidized, voluntary program of supplemental medical insurance which covers, in general, 80% of the reasonable cost of certain medical expenses that are excluded from the Part A program.

Under Part B, Medicare enrollees obtain benefits in return for the payment of monthly premiums in an amount determined by the Secretary of Health and Human Services. *See id.* § 1395r(b)–(c); § 1395t. These premiums, together with contributions from the federal government, make up the Federal Supplementary Medical Insurance Trust Fund (the "Trust Fund"). *Id.* § 1395t.

Physicians may routinely accept assignment of claims for treatment of Part B Medicare patients, or may accept assignment of Medicare claims on a selective basis, or may refuse to accept assignment of any Medicare claims. Physicians who do accept assignment of claims for services rendered under Part B agree to accept the charges approved by Medicare in full satisfaction for their services and submit claims and receive reimbursement directly from the carrier under the Part B program. When a claim is unassigned, that is, when a physician does not accept assignment, the physician is obligated to prepare and submit the Medicare claim form to the carrier on behalf of the patient, but the carrier then sends reimbursement directly to the patient. On such unassigned claims the physician looks directly to the patient or his or her private insurance carrier for payment.

In 1984, Congress enacted a sweeping cost-control provision in Section 2306 of the Deficit Reduction Act, Pub.L. No. 98–369, 98 Stat. 494 ("DEFRA") (codified at 42 U.S.C. § 1395u(h)). Prior to DEFRA, all physicians were permitted to decide on a claim-by-claim basis whether or not to accept assignment of Medicare claims. If a physician chose not to accept assignment, Medicare placed no limitation on the amount that he or she could charge a Medicare beneficiary. Medicare reimbursement, however, was limited to a "reasonable charge" as determined by Medicare, leaving the beneficiary responsible for the difference between the physician's actual charge and the Medicare reimbursement.

DEFRA altered the previous system by requiring physicians to indicate each year whether they would be Medicare "partici-

pating" or "non-participating" physicians. *See* 42 U.S.C. § 1395u(h). A participating physician was defined as one who agreed, for the period of participation, to accept assignment of his patients' right to reimbursement and to accept the Medicare reasonable charge as payment in full for all items or services furnished to Medicare beneficiaries. A non-participating physician was defined as one who decides on an individual basis whether to accept such assignment or to bill the patient directly. DEFRA froze the fees the non-participating physicians could charge Medicare beneficiaries at the level of the physician's "actual charges" for the calendar quarter beginning April 1, 1984.

In the health care provisions of the Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–509, 100 Stat. 1874 ("OBRA–86"), Congress further restricted the amounts non-participating physicians could charge Medicare beneficiaries. Section 9331 of OBRA–86 effectively replaced the DEFRA fee freeze by limiting non-participating physicians' charges to Medicare beneficiaries in accordance with a formula called the physician's "Maximum Allowable Actual Charge" ("MAAC"). The MAAC as originally enacted was based on the physician's actual charges for the second quarter of 1984 but was subject to adjustment in limited circumstances after administrative review. *See* 42 U.S.C. § 1395ff.

The health care provisions of OBRA–89 mandate the conversion of the Medicare reimbursement system to one based on a Medicare fee schedule, incorporating a "relative value scale" and an annual "conversion factor" instead of employing prevailing fees. 42 U.S.C. § 1395w–4(a). Section 6102(a) of OBRA–89 effectively replaces the MAAC fee limitation formula with a different concept called the "limiting charge." 42 U.S.C. § 1395w–4(g). Under this concept, as of January 1, 1991, physicians who do not accept assignment of Medicare approved amounts in full satisfaction of their fees are, in most instances, prohibited from charging any Medicare patient more than 125% of the fee allowed by Medicare for the services rendered.

Beginning January 1, 1992, the "recognized payment" or reimbursed portion of the fee for a physician's service to a Medicare patient is determined on the basis of a number of criteria, including the "relative value" for the service as determined under OBRA–89 section 6102(c)(2), the "conversion factor" for the year established under subsection (d), and the "geographic adjustment factor" for the service for the fee schedule area established under subsection (e)(2). 42 U.S.C. § 1395w–4(b)(1). Under section 6102(a), effective January 1992, the limiting charge may not be higher than 120% of the recognized payment amount, and after 1992, the limiting charge may not be higher than 115% of the recognized payment amount. 42 U.S.C. § 1395w–4(g)(2).

Physicians whose charges exceed the limiting charge are subject to sanctions which include penalties of up to $2,000 per violation plus twice the amount claimed for the service in accordance with 42 U.S.C. § 1395u(j)(2). *See* 42 U.S.C. § 1395w–4(g)(1).

Plaintiffs contend that the limiting charge restriction, as applied to hospital-based anesthesiologists, is unconstitutional because it is arbitrary and discriminatory, and because it is demonstrably irrelevant to valid Congressional policy. Plaintiffs further contend that the limiting charge restriction violates the due process clause and equal protection component of the Fifth Amendment and violates that Fifth Amendment prohibition against the taking of private property for public use without just compensation.

## DISCUSSION

### I. Applicable Legal Standard

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In the instant case, there is little dispute over the material facts. While the parties do dispute several points of law, legal questions present nothing for trial and are appropriately resolved on a motion for summary judgment. *See Holland Industries, Inc. v. Adamar of New Jersey Inc.*, 550

F.Supp. 646 (S.D.N.Y.1982); *Flair Broadcasting Corp. v. Powers*, 733 F.Supp. 179 (S.D.N.Y.1990). The Court thus decides the parties' motions as a matter of law.

## II. Standing

■ Defendants challenge standing as to the three plaintiff patients. The plaintiff patients, Bertha Garelick, Yolanda Restaino, and Elena Savino, allege that the fee restrictions of section 6102(a) of OBRA–89 violate their rights under a number of constitutional provisions, including the equal protection component and the due process clause of the Fifth Amendment.

The Supreme Court has summarized the elements of standing as follows:

> [A]t an irreducible minimum Art. III [of the Constitution] requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 [99 S.Ct. 1601, 1608, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976).

*Valley Forge Christian College v. Americans United for Separation of Church and State Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (footnote omitted).

Defendants aver that the plaintiff patients do not satisfy these criteria because they have not alleged any actual or threatened injury that "fairly can be traced" to the actions of defendants. Defendants note that the injury that these patients assert is that the statute forces limited-income beneficiaries who are treated by non-participating anesthesiologists to accept liability for payment of an additional 25% in fees above the amount they would owe if non-participating anesthesiologists were free to charge higher fees to wealthier Medicare patients and thereby subsidize their charging of lower fees or acceptance of assignment in the case of poorer patients. *See* Complaint, ¶¶ 27, 28, 30, 32, 34, 35.

The essence of defendants' argument is that it is an entirely speculative proposition that, because of the limiting charge, anesthesiologists who would otherwise do so will not charge lower fees or accept assignment of poorer patients. Defendants maintain that the statute does not force anesthesiologists to collect the full 25% above the Medicare fee level; the statute simply limits the fees that anesthesiologists and other physicians may charge their Medicare patients. Thus, defendants maintain that while the fee reduction may lead some anesthesiologists to require the full charge from all patients, the decision to do so will have been made independently by each anesthesiologist and necessarily involves a choice among a range of alternatives. Defendants conclude that because the decision to charge the full 25% is discretionary on the part of the individual physician and not required by the statute, plaintiffs may not rely upon the statute to obtain standing. The Court agrees.

Where an injury results from the "independent action of a third party," the causal link between the plaintiff's injury and the defendant's conduct is too attenuated to establish standing to sue. *Allen v. Wright*, 468 U.S. 737, 757–59, 104 S.Ct. 3315, 3327–29, 82 L.Ed.2d 556 (1984). As one court has noted in dismissing a challenge by patient plaintiffs to the DEFRA fee freeze:

> Federal courts cannot entertain claims which are founded on sheer speculation as to what may or may not happen under particular circumstances. This Court may only hear those disputes which are real, immediate, and concrete, that is, cases or controversies. This Court cannot rely on promises or threats of future action vaguely contingent upon the outcome of certain other events or decisions; it cannot rely on mere possibilities of fact.

*American Medical Ass'n v. Heckler*, 606 F.Supp. 1422, 1435 (S.D.Ind.1985).

Plaintiffs have cited *Cosgrove v. Bowen*, No. 85 Civ. 4472, 1988 WL 253323 (S.D.N.Y.)· (Oct. 31, 1988), an unreported decision, as their only support for standing. That case does not address the standing issue [1] and is therefore unpersuasive. Given the speculative nature of the patient plaintiffs' claims as to the effect of section 6102(a) upon them, the Court finds that these plaintiffs lack standing in the instant case.[2]

### III. Substantive Due Process Claim

■ Plaintiff doctors challenge the constitutionality of section 6102(a) on substantive due process grounds, arguing that the statute forces hospital-based anesthesiologists to accept a fee limitation in every case in which the patient is enrolled in Medicare despite the fact that the anesthesiologists are not free to refuse to treat Medicare patients. Complaint ¶ 27.

The test for determining whether economic and social regulation meets substantive due process requirements is well established: "[i]f the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied...." *Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934). As the Eleventh Circuit observed in *Whitney v. Heckler*, 780 F.2d 963 (11th Cir.1986), Congress intended to accomplish two objectives in enacting DEFRA § 2306: First, in order to curtail the increase in the federal deficit, Congress effected a fifteen-month freeze in the amounts paid by Medicare for physicians' services. Second, in order to ensure that non-participating physicians would not make up any profits lost as a result of the freeze by raising their nonreimbursed charges to Medicare patients, Congress placed a ceiling on the amount non-participating physicians could charge such patients. *See Whitney*, 780 F.2d at 969–70.

Finding DEFRA § 2306 reasonably related to these proper legislative purposes, the Eleventh Circuit dismissed plaintiffs' due process challenge. *See id.* at 971. *See also American Soc. of Cataract & Refractive Surgery v. Bowen*, 725 F.Supp. 606 (D.D.C.1989) (rejecting due process challenge to constitutionality of sections 9331 and 9334 of OBRA–86); *American Medical Ass'n v. Heckler*, 606 F.Supp. 1422 (S.D.Ind.1985) (rejecting due process challenge to DEFRA § 2306).

Plaintiffs' due process challenge to section 6102(a) of OBRA–89 cannot be meaningfully distinguished from the due process challenges against DEFRA and OBRA–86 by the plaintiff doctors in *Whitney* and the other cases cited above. As defendants note, OBRA–89 extends the restrictions on physician charges enacted in section 9331 of OBRA–86, adopting the same approach of limiting Medicare payments for physician services while protecting Medicare beneficiaries from cost shifting by physicians. *See* H.Rep. No. 101–247, 101st Cong., 1st Sess. 348, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906, 2074. Thus, section 6102(a) of OBRA–89, like its predecessors, bears a reasonable relationship to Congress's goal of preventing Medicare beneficiaries from carrying the burden of the reduction of Medicare expenditures. The Court therefore grants defendants' motion to dismiss plaintiffs' due process claims.

### IV. Fifth Amendment Takings Claim

■ Plaintiffs argue strenuously that in the instant case, Congressional price control of private physician fees is a taking of private property without just compensation. If the Court were writing on a clean slate, that argument might have considerable logical force. Plaintiffs have invested substantial amounts of time and money in

---

**1.** Moreover, the plaintiff patients in *Cosgrove* challenged a regulation, 42 C.F.R. § 405.551(e), as unlawful because it reduced by two-thirds the Medicare reimbursement they would otherwise have been entitled to receive. *See Cosgrove v. Bowen*, 649 F.Supp. 1433, 1436 (S.D.N.Y.1986) (earlier opinion in same case). That case is thus readily distinguishable since the injury al-

leged did not result from the independent action of a third party.

**2.** Because the Court finds that the plaintiff patients lack standing, the Court does not consider plaintiff patients' Fifth Amendment due process and equal protection claims.

their medical education and training, and their expert services are their only stock in trade. If they are compelled by existing contracts with hospitals to supply these services to Medicare patients at below-market prices, a portion of their asset value would be confiscated for the benefit of others. It is not easy to see how such a shifting, to a private group, of financial responsibility for the alleviation of a public problem they did not create could square with the Fifth Amendment's prohibition against taking property without just compensation.

It is axiomatic that the Fifth Amendment's just compensation provision is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'

*First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 318–19, 107 S.Ct. 2378, 2387–88, 96 L.Ed.2d 250 (1987) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).

However, the most closely applicable judicial precedents are to the contrary. For example, in *Whitney,* the Court of Appeals for the Eleventh Circuit ruled that DEFRA's temporary freezing of the fees charged by physicians to Medicare patients was not a Fifth Amendment "taking" because physicians could refuse to accept such patients:

It is well established that government price regulation does not constitute a taking where the regulated group is not required to participate in the regulated

industry. *Bowles v. Willingham,* 321 U.S. 503, 517–18 [64 S.Ct. 641, 648–49, 88 L.Ed. 892 (1944)].... In the instant case, appellants are not required to treat Medicare patients and the temporary freeze is therefore not a taking within the meaning of the Fifth Amendment.

780 F.2d at 972.

Plaintiffs attempt to distinguish *Whitney* on the ground that, as hospital-based anesthesiologists, they may not refuse to treat Medicare patients. But this is, at most, a difference in degree. While it is undoubtedly true that by far the largest share of anesthesiology is performed in hospitals, and hospitals are required by law to accept Medicare patients, plaintiffs have the option of practicing outside of hospitals,[3] and may even be able to practice in hospitals and still decline to serve Medicare patients.[4] There is, of course, a strong economic incentive for them to accept Medicare patients, even at the ceiling fees, but the physicians in *Whitney* were under similar economic pressure not to refuse Medicare enrollees, who assertedly constituted 50 to 60% of their patients. 780 F.2d at 967–68.

The *Whitney* court relied upon the decision of the Court of Appeals for the Eighth Circuit in *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare,* 742 F.2d 442 (8th Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). In that case, the Court upheld Minnesota's restrictions on rates nursing homes which participated in the State's Medicaid program could charge to non-Medicaid residents, ruling that "nurs-

**3.** Plaintiffs appear to concede this in their assertion that the "vast majority" of anesthesiologists must be hospital-based. *See* Pltf. Reply Mem. at 4. By implication, this statement indicates there must be a minority of anesthesiologists who are not hospital-based.

**4.** Defendants contend that New York law merely requires *hospitals* to afford each patient the right to treatment without discrimination as to the source of payment. *Patients' Bill of Rights,* 10 NYCRR § 405.7(c)(2); *see also id.,* § 405.-7(b)(2). Defendants aver further that nothing in the law "locks in" any hospital-based anesthesiologist or any other hospital-based physician to treat Medicare patients. As long as a hospital

can supply an anesthesiologist who will treat Medicare patients, defendants maintain that a patient's rights are not violated under New York law.

Plaintiffs respond that if a hospital is legally barred from discriminating against patients based on source of payment, it cannot enter into an agreement with individual members of the hospital staff not to treat patients based on source of payment.

Neither side has cited any case law in support of its position, and the Court does not decide the question of whether New York hospitals may reach agreements with hospital-based physicians not to treat medicare patients.

ing homes, unlike public facilities, have freedom to decide whether to remain in business and thus subject themselves voluntarily to the limits imposed by Minnesota on the return they obtain from investment of their assets in nursing home operations." *Id.* at 446. The courts in both *Whitney* and *Minnesota Association* relied in turn on the early rent control case of *Bowles v. Willingham,* 321 U.S. 503, 517–18, 64 S.Ct. 641, 648–49, 88 L.Ed. 892 (1944), in which the Supreme Court held that the rent control provisions at issue did not constitute a prohibited taking because the statute did not require landlords to offer their apartments for rent.

In the instant case, the economic pressure on plaintiffs to continue serving Medicare patients is not clearly greater than the pressures faced by the nursing home operators in *Whitney,* whose only practical alternatives to doing business under price controls were to refuse all Medicare patients or to go out of business, or by the landlord in *Willingham,* whose only practical alternative to doing business under price controls was to sell her properties at prices depressed by the rent ceilings. This Court therefore finds these judicial precedents, if not philosophically persuasive, at least legally compelling.

Moreover, it must be noted that even if the facts of this case were such that plain-

tiff anesthesiologists had no choice but to subject themselves to the Medicare limits imposed by Congress, this would not end the Court's inquiry. Plaintiffs assert that it is "beyond question" that price regulation can amount to a taking,[5] citing, *inter alia,* the public utility rate cases of *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989), and *Jersey Central Power & Light Co. v. FERC,* 810 F.2d 1168 (D.C.Cir.1987). But these cases, and the Supreme Court's seminal decision in *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), make clear that plaintiffs' burden is not met by showing mere legal compulsion. To the extent that *Hope* and its progeny are applicable in the present context, these cases would require plaintiffs to make a showing that the ceiling at 125% (decreasing to 115% after 1992) of the Medicare fee is insufficient to afford plaintiffs reasonable compensation for their services. *See Hope,* 320 U.S. at 603, 64 S.Ct. at 288. Here plaintiffs have not attempted nor even offered to establish that this level of remuneration does not adequately compensate hospital-based physicians for their services.

## CONCLUSION

For the above stated reasons, plaintiff patients have no standing in the action.

---

**5.** Plaintiffs also proffer a related argument, derived from Justice Scalia's concurring opinion in *Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988). Plaintiffs insist that owners of property subject to government price regulation are singled out unfairly to shoulder public burdens unless their use of the property can be said to be the source of the social evil to be remedied. *See id.* at 20, 108 S.Ct. at 862.

Plaintiffs' reliance on Justice Scalia's concurring opinion in *Pennell* is, however, misplaced. The majority of the Court, in an opinion by Chief Justice Rehnquist, upheld the city rent control ordinance at issue, ruling that the law did not violate due process and that petitioner's takings claim was premature. *See id.* at 9–10, 108 S.Ct. at 856–57. Therefore, Justice Scalia's analysis of the takings claim, although it has considerable logical force and may foreshadow a future shift in Supreme Court jurisprudence, is not a binding statement of the law. Furthermore, Justice Scalia's opinion is at odds with settled Supreme Court doctrine that has "con-

sistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 440, 102 S.Ct. 3164, 3178, 73 L.Ed.2d 868 (1982) (citing *Bowles v. Willingham,* 321 U.S. 503, 517–18, 64 S.Ct. 641, 648–49, 88 L.Ed. 892 (1944)). *See also Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 131, 98 S.Ct. 2646, 2663, 57 L.Ed.2d 631 (1978) ("Stated baldly, appellants' position appears to be that the only means of ensuring that selected owners are not singled out to endure financial hardship for no reason is to hold that any restriction imposed on individual landmarks pursuant to the New York City scheme is a 'taking' requiring the payment of 'just compensation.' Agreement with this argument would, of course, invalidate not just New York City's law, but all comparable landmark legislation in the Nation. We find no merit in it.").

Plaintiff physicians' motion for summary judgment is denied and defendants' cross-motion for summary judgment dismissing all of plaintiffs' claims is granted.

SO ORDERED.