[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13917

_____

D.C. Docket No. 3:12-cv-01232-HES-JRK

BAKER COUNTY MEDICAL SERVICES, INC.,
Ed Fraser Memorial Hospital,

Plaintiff - Appellant,

versus

U.S. ATTORNEY GENERAL,
DIRECTOR, U.S. DEPARTMENT OF HOMELAND SECURITY,
U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, OFFICE OF
DETENTION AND REMOVAL,
U.S. MARSHAL WILLIAM B. BERGER, SR.,
United States Marshals Service, Prisoner & Operations Division,
Programs and Assistance Branch,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 14, 2014)

Before JORDAN, Circuit Judge, and RYSKAMP[*] and BERMAN,[**] District Judges.

JORDAN, Circuit Judge:

The federal government bears a constitutional "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Pursuant to 18 U.S.C. § 4006(b)(1), Congress has elected to impose the Medicare rate as full compensation for medical services rendered to federal detainees.

Baker County Medical Services, d.b.a. Ed Fraser Memorial Hospital – a small, rural hospital in Baker County, Florida – sued various federal agencies and officials in federal district court, seeking a declaratory judgment that § 4006(b)(1) is unconstitutional as applied.[1] This appeal requires us to decide whether the Hospital can challenge this compensation scheme as an unconstitutional taking under the Fifth Amendment, even though it has voluntarily opted into the Medicare program and is, as a result, required to provide emergency services to federal

---

[*] Honorable Kenneth L. Ryskamp, United States District Judge for the Southern District of Florida, sitting by designation.

[**] Honorable Richard M. Berman, United States District Judge for the Southern District of New York, sitting by designation.

[1] The Hospital also sought to recover in quantum meruit for the difference between its actual costs for providing emergency care to federal detainees and the amount it was reimbursed at the Medicare rate for such care since 2009. The district court dismissed the quantum meruit count as barred by sovereign immunity, and the Hospital concedes that this claim fails as a matter of law.

detainees.  With benefit of oral argument, and for the reasons that follow, we conclude that the Hospital may not bring such a challenge, and affirm the district court's dismissal of the Hospital's declaratory judgment claim.

## I

We review the grant of a motion to dismiss *de novo*. *See Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1265 (11th Cir. 2013).  Our review of constitutional questions is likewise plenary.  *See United States v. Paige*, 604 F.3d 1268, 1274 (11th Cir. 2010).

In applying the Rule 12(b)(6) standard, we construe the complaint in the light most favorable to the Hospital, accepting all well-pleaded factual allegations as true.  *See Miyahira,* 715 F.3d at 1265.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Hospital is a 25-bed facility that houses and operates the only emergency room in Baker County.  As a Medicare provider, it must accept the Medicare payment rate as full compensation for treatment for Medicare participants.  Although the government has contracted with a provider to provide on-site medical services for federal detainees housed in a local detention facility, the Hospital has entered into no similar contract with the government to render off-

site emergency care to federal detainees, who do not qualify as Medicare participants. *See* 42 C.F.R. § 411.4. The Hospital nevertheless does afford emergency services to such individuals, in keeping with its obligation to provide emergency medical treatment to all patients irrespective of their ability to pay under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and Florida law.

The Hospital sought a declaratory judgment that 18 U.S.C. § 4006(b)(1), as applied, amounts to an unconstitutional taking. According to the Hospital, it is forced to render emergency medical care to federal detainees but its compensation for such treatment is limited to the Medicare rate, an amount less than its actual costs. The district court dismissed the Hospital's complaint with prejudice, ruling that no taking occurred because the Hospital is under no general obligation to provide emergency treatment to federal detainees. The district court reasoned that the Hospital's only putative obligation to provide such treatment under federal law stemmed from voluntary participation in Medicare and from EMTALA, and that did not create the requisite legal compulsion to constitute a taking. The Hospital appeals.

## II

Under the Takings Clause of the Fifth Amendment, "private property" shall not "be taken for public use, without just compensation." U.S. Const., amend. V.

4

Although "[t]he paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property," the Supreme Court has recognized that "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster" so as to effect a regulatory taking.  *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).

Even so, a long line of cases instructs that no taking occurs where a person or entity voluntarily participates in a regulated program or activity.  We have said that "[i]t is well established that government price regulation does not constitute a taking of property where the regulated group is not required to participate in the regulated industry." *Whitney v. Heckler*, 780 F.2d 963, 972 (11th Cir. 1986).  *See also Yee v. City of Escondido, Cal.*, 503 U.S. 519, 527 (1992) ("the Takings Clause requires compensation if the government authorizes a compelled physical invasion of property"); *Franklin Mem. Hosp. v. Harvey*, 575 F.3d 121, 129 (1st Cir. 2009) ("Of course, where a property owner voluntarily participates in a regulated program, there can be no unconstitutional taking."); *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993) ("[W]here a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking."); *Burditt v. U.S. Dept. of Health and Human Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991) (holding that physician could not

5

challenge imposition of a penalty for violation of EMTALA under Takings Clause because, among other things, he voluntarily accepted "responsibility to facilitate a hospital's compliance with EMTALA"); *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984) (finding no taking because "Minnesota nursing homes . . . have freedom to decide whether to remain in business and thus subject themselves voluntarily to the limits imposed by Minnesota on the return they obtain from investment of their assets in nursing home operation"); *St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 884 (7th Cir. 1983) (holding that diminished market value does not constitute a taking where plaintiffs "retain full rights and control over their net investment").

The Hospital does not dispute these general legal principles. Instead, as it succinctly frames its argument, the Hospital maintains that "because 18 U.S.C. § 4006 is not contained in, cross-referenced by, or itself ever referenced in, the Medicare or EMTALA statutes, [its] voluntary participation in both of those federal programs does not, expressly or by default, mean that [it] must agree to accept less than cost reimbursement for the treatment of federal detainees." Appellant's Reply Br. at 1. To determine whether the Hospital is correct, we first consider the statutory framework of Medicare, Florida law regulating emergency treatment, and § 4006(b)(1), and then turn to Takings Clause precedent.

6

**A**

Medicare is a federally subsidized medical insurance program for persons over the age of 65 or recipients of social security disability benefits. *See* 42 U.S.C. § 1395 et seq. The program is comprised of two sections. Part A focuses on providing insurance and reimbursement for the costs of hospital, post-hospital, home health, and hospice care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B is a voluntary supplemental insurance program for Medicare beneficiaries who pay premiums for additional insurance. *See* 42 U.S.C. § 1395j.

As a condition of participating in and receiving payments from Medicare, a hospital must also opt into EMTALA. *See* 42 U.S.C. § 1395cc(a)(1)(I)(i). EMTALA requires hospitals with emergency departments to provide a medical screening to anyone who enters an emergency room and requests an examination for a medical condition. *See* 42 U.S.C. § 1395dd(a). If the hospital determines that the patient has an emergency medical condition, it must either provide medical services to stabilize the condition or transfer the patient to another medical facility. *See* 42 U.S.C. § 1395dd(b)(1)(a)-(b). The hospital must meet these obligations without regard to the patient's ability to pay. *See* 42 U.S.C. § 1395dd(h).

In keeping with the Florida Legislature's intent "that emergency services and care be provided by hospitals and physicians to every person in need of such

7

care," Fla. Stat. § 395.1041(1), Florida law imposes similar obligations of its own. One statute, for example, requires every general hospital with an emergency department to provide emergency care for any emergency condition when "[a]ny person requests emergency services and care," regardless of ability to pay. *See* Fla. Stat. § 395.1041(3)(a)(1), (f). In addition, "[a] person may not be denied treatment for any emergency medical condition that will deteriorate from a failure to provide such treatment at any general hospital licensed under [C]hapter 395 [of the Florida Statutes] . . . ." Fla. Stat. § 401.45(1)(b).

## B

Neither Medicare nor EMTALA establishes the reimbursement rate for emergency services provided to federal detainees. Congress instead chose to codify such a compensation scheme under 18 U.S.C. § 4006(b)(1), which provides that "[p]ayment for costs incurred for the provision of health care items and services for individuals in the custody of the United States Marshals Service, the Federal Bureau of Investigation and the Department of Homeland Security shall be the amount billed, not to exceed the amount that would be paid for the provision of similar health care items and services under the Medicare program . . . ."

Notably, although it sets a maximum reimbursement rate for the treatment of federal detainees, § 4006 includes no underlying requirement that hospitals provide such treatment in the first place. Nor is § 4006 cross-referenced in Medicare.[2]

The only other federal authority to which the parties point that mandates a hospital's treatment of federal detainees is EMTALA, which, as noted above, requires participating hospitals to provide care to anyone who visits an emergency room. Hence, although the Hospital is correct that neither Medicare nor EMTALA expressly incorporates the reimbursement scheme codified in § 4006(b)(1), these acts are not wholly removed from one another; hospitals which undertake the obligation to treat federal detainees by opting into Medicare and EMTALA are governed by the reimbursement rate separately set in § 4006(b)(1).

## C

Because opting into EMTALA has committed the Hospital to treat all emergency patients, including federal detainees, we must decide whether voluntarily providing such care precludes the Hospital from challenging as a taking the rate at which it is compensated under § 4006(b)(1). We conclude that it does.

In *Bowles v. Willingham*, 321 U.S. 503 (1944), the Supreme Court annunciated the principle that voluntary participation in a regulated program

---

[2] Indeed, § 4006 is codified in Title 18 of the U.S. Code, which regulates crimes and criminal procedure.

9

defeats a takings clause challenge.  In that case, the Court analyzed a constitutional challenge to a wartime federal rent control statute that resulted in a reduction in property value.  The Court held that the statute did not effect a taking, reasoning that it did not compel landlords to offer their apartments for rent, and recognizing that "price control, the same as other forms of regulation, may reduce the value of the property regulated."  *Id*. at 517-18.

Four decades later, we applied this rule to the regulation of Medicare reimbursement in *Whitney*.  In that case, a group of physicians challenged a temporary statutory freeze on fees charged to Medicare patients as an unconstitutional taking.  Underscoring that the physicians were "not required to treat Medicare patients," and observing that "the fact that Medicare patients comprise a substantial percentage of their practices does not render their participation [in Medicare] 'involuntary,'" we held that the freeze did not constitute a taking.  *See* 780 F.2d  at 972 & n.12.

Our sister circuits have come to similar conclusions in considering Takings Clause challenges to Medicare and Medicaid price regulation schemes.  We find their decisions instructive.

In *Garelick,* for instance, the Second Circuit ruled that certain limitations on permissible charges under Medicare Part B did not amount to a taking.

Analogizing between the predicaments of the anesthesiologist plaintiffs in that case and the landlords in *Bowles*, the Second Circuit concluded that the challenged provisions "do not require anesthesiologists, or any other physicians, to provide services to Medicare beneficiaries," but instead "simply limit the amounts [the plaintiffs] may charge those Medicare beneficiaries whom they choose to serve." 987 F.2d at 916.  The anesthesiologists' argument that New York state law created the requisite legal compulsion by forcing them to treat all patients, including Medicare beneficiaries, did not change the outcome, as such a theory hinged on the notion that it was the state, which was not a party in the case, "that indirectly compel[led] anesthesiologists to treat Medicare patients and thus submit to price regulations, not the federal government." *Id.*  The Second Circuit also concluded that the anesthesiologists' ethical duty to treat Medicare patients did not render such treatment involuntary, reasoning that "such self-imposed requirements do not constitute the kind of governmental compulsion that may give rise to a taking." *Id*. at 917-18.

The Eighth Circuit reached an analogous result in analyzing a takings challenge to a Minnesota statute conditioning nursing homes' participation in the state's Medicaid program on acceptance of limits on rates charged to certain residents. *See Minn. Ass'n of Health Care Facilities,* 742 F.2d at 446.  Although it recognized "the strong financial inducement to participate in Medicaid," the Eighth

11

Circuit concluded that "a nursing home's decision to do so is nonetheless voluntary," a fact that "forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation[.]" *Id.* It declined the nursing homes' invitation to apply cases analyzing takings in the context of public utility rates, reasoning that, unlike public utilities, nursing homes "have freedom to decide whether to remain in business and thus subject themselves voluntarily to the limits imposed by [the state] on the return they obtain from investment of their assets in nursing home operation." *Id.*

## D

For the same reason the landlords in *Bowles* and the plaintiffs who contested Medicare and Medicaid payment schemes in its wake could not prevail, the Hospital's takings challenge to the reimbursement rate in § 4006(b)(1) fails. Like those plaintiffs, the Hospital seeks to challenge its rate of compensation in a regulated industry for an obligation it voluntarily undertook (namely, providing emergency treatment to federal detainees) when it opted into Medicare and became subject to EMTALA. *See Whitney*, 780 F.2d at 972 (holding that no taking occurred because physicians were "not required to treat Medicare patients").

12

The Hospital attempts to distinguish *Whitney* and the other post-*Bowles* cases discussed above on the ground that they addressed legal compulsion in the context of Medicare or Medicaid, rather than compulsion under a separate statute regulating reimbursement for treatment of federal detainees.  But we see no meaningful difference in the Fifth Amendment sense.  Just as physicians who voluntarily treat Medicare beneficiaries cannot establish the legal compulsion necessary to challenge Medicare reimbursement rates as a taking, so too is the Hospital precluded from challenging the rate at which it is compensated for its voluntary treatment of federal detainees, a regulated industry in which the Hospital as a "regulated group is not required to participate."  *Whitney*, 780 F.2d at 972.

The Hospital also disputes the notion that its participation in Medicare and EMTALA, and by extension its treatment of federal detainees, is truly voluntary, but its arguments do not change our analysis.  The Hospital maintains that, even if it were to withdraw from Medicare and EMTALA, it would have no practical choice but to continue treating federal detainees who require emergency services because Florida state law compels it to treat everyone who enters its emergency room.  But the Hospital has neither named the state as a defendant nor challenged the constitutionality of the relevant Florida statutes, and hence cannot lay "indirect" compulsion on the part of the state at the feet of the federal government. *See Garelick*, 987 F.2d at 916.

13

Although the Hospital contends that opting out of Medicare would amount to a grave financial setback, "economic hardship is not equivalent to legal compulsion for purposes of takings analysis." *Id.* at 917. *See also Minn. Ass'n of Health Care Facilities,* 742 F.2d at 446 (holding that a "strong financial inducement to participate" in a regulated program does not render such participation involuntary). This contention, therefore, does not carry the day.

Finally, the Hospital points out that its withdrawal from Medicare would leave Medicare participants with no hospital in Baker County from which they could receive emergency care.  This grim prospect provides a sympathetic backdrop for the Hospital's takings challenge and, if it came to pass, would result in hardship to Medicare participants in Baker County.  Yet it does not diminish the underlying voluntariness of the Hospital's participation in Medicare, as "the fact that practicalities may in some cases dictate participation [in Medicare] does not make participation involuntary." *St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 875 (7th Cir. 1983).[3]

## III

We recognize the financial difficulties and perceived inequity that may come with shortfalls in a rural hospital's reimbursement for costs associated with

---

[3] As counsel for the Hospital acknowledged at oral argument, the fact that the Hospital is the only one of its kind in Baker County does not affect the merits of its Fifth Amendment claim.

14

providing emergency treatment to federal detainees, but conclude that the Takings Clause of the Fifth Amendment is not the proper vehicle for altering this harsh reality. As is so often the case, the Hospital's most effective remedy may lie with Congress rather than the courts.

The district court's dismissal of the Hospital's declaratory judgment action is affirmed.

**AFFIRMED**.